## KHAN v. LEO FEIST, Inc., et al.

District Court, S. D. New York.

Feb. 24, 1947.

called "Victory Calypsoes, 1943 Souvenir Collection" published and copyrighted in Trinidad, B.W.I., on March 1, 1943.

The plaintiff obtained a United States copyright for the booklet on June 29, 1945, following an ad interim copyright of May 1, 1945, granted pursuant to Presidential proclamation of March 14, 1944, No. 2608, extending the time of a national of Great Britain to comply with the provisions of the applicable portion of the United States Copyright Statute 17 U.S.C.A. § 8, the required reciprocal recognition benefits of copyright between the United States and Great Britain being present.

The booklet is a modest paper-bound 28-page affair containing the lyrics of this and other songs which were rendered by Calypso singers in tent shows on the Island of Trinidad during 1942 and 1943.

The defendants obtained a United States copyright for their song "Rum and Coca-Cola" in December of 1944, first in the name of defendant Amsterdam, and later in the joint names of himself and the other individual defendants, the copyright notice reading: "Copyright 1944 Leo Feist, Inc., 1619 Broadway, New York, N. Y."

The infringement here charged has to do with the chorus of these two songs, which may be compared for convenience as follows:

| Plaintiff's Work | Defendants' Work |
| --- | --- |
| "They buy rum and co-co-cola | "Drinkin' Rum and Coca Cola |
| Go down Point Cumana | Go down 'Point Koomah-nah' |
| Both mother and daughter | Both Mother and Daughter |
| Working for the Yankee dollar" | Workin' for the Yankee Dollar." |

Also the first verses as respectively printed may be compared as throwing light upon defendant Amsterdam's assertion of original composition:

| Plaintiff's Work | Defendants' Work |
| --- | --- |
| "Since the Yankees came to Trinidad | "Since the Yankee come to Trinidad |
| They have the young girls going mad | They got the young girls all goin' mad |
| The young girls say they treat them nice | Young girls say they treat 'em nice |
| And they give them a better price." | Make Trinidad like Paradise." |

Emil K. Ellis, of New York City (Myron A. Ellis, of New York City, and Abraham J. Heller, of Brooklyn, N. Y., of counsel), for plaintiff.

Julian T. Abeles, of New York City, (Benjamin G. Weil, of New York City, of counsel), for defendants.

BYERS, District Judge.

The plaintiff alleges infringement by the defendants of the former's copyright of the words and lyrics of the song "Rum and Coca-Cola" contained in a booklet

452

The complaint was filed August 10, 1945, forty-two days after the plaintiff obtained his United States copyright.

In addition to denials, the answers of the defendants, which are uniform, assert the following defenses:

First: Failure to state a claim upon which relief can be granted.

Second: "Plaintiff's work is inherently salacious, immoral and lewd", and is not subject to copyright protection.

At the trial the following defenses were added without objection:

Third (as a partial defense): In effect, that plaintiff's copyright being for a book, the only protection afforded was against printing, reprinting, etc., after March 13, 1945.

Fourth: Laches creating estoppel.

Fifth: "Plaintiff does not have title to the alleged copyright or the rights thereunder which said defendant is alleged to infringe."

Whether plaintiff has indeed deraigned title to the copyright upon which he relies, requires consideration at the threshold of his case.

The United States copyright depends for its legal efficacy upon that which was granted in Trinidad, and since the plaintiff was not the author of the literary achievement in question, it becomes necessary to inquire whether he was the "copyright owner or proprietor" of the work first produced or published in Trinidad, according to the statutory requirement, in order that the Presidential proclamation might operate in his favor. Attention is thus drawn to the copyright law of England as it applied to the English possession known as Trinidad, when the plaintiff's rights are said to have arisen.

The British Copyright Act of 1911 has been offered in evidence, and according to its terms, copyright subsists throughout His Majesty's Dominions to which the Act extends, in literary work, if so published.

"* * * 'copyright' means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatsoever, * * *."

Certain other material provisions will be quoted:

"5.—(1) Subject to the provisions of this Act, the author of a work shall be the first owner of the copyright therein:

"Provided that—

"(a)  *  *  *

"(b) where the author was in the employment of some other person under a contract of service or apprenticeship and the work was made in the course of his employment by that person, the person by whom the author was employed shall, in the absence of any agreement to the contrary, be the first owner of the copyright, but where the work is an article or other contribution to a newspaper, * * * (not material here)."

"(2) The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations to the United Kingdom or any self-governing dominion or other part of His Majesty's dominions to which this Act extends, and either for the whole term of the copyright or for any part thereof, and may grant any interest in the right by licence, but no such assignment or grant shall be valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by his duly authorised agent;"

"27. The Legislature of any British possession to which this Act extends may modify or add to any of the provisions of this Act in its application to the possession, but, except so far as such modifications and additions relate to procedure and remedies, they shall apply only to works the authors whereof were, at the time of the making of the work, resident in the possession, and to works first published in the possession."

The provision just quoted would seem to mean that, if Trinidad, being a British possession, chose to, it could modify or add to the provisions of the Act in respect of matters other than of procedure and remedies, i.e., matters of substance, such perhaps as the requirement that an assignment of copyright be in writing, according to section 5 above; the plaintiff relies upon Barnett v. Glossop, 1 Bingham's New Cases 633, to sustain its contention that the requirement is merely procedural.

It is not disputed that the Copyright Act of Great Britain was adopted in Trinidad and a Copyright Ordinance was duly enacted (Chapter 31, Number 16—Revised Ordinances of 1940, Trinidad and Tobago) as follows:

"1. This ordinance may be cited as the copyright ordinance.

"2. In this ordinance, infringement, when applied to a copy of a work in which copyright subsists, means any copy including any colorable imitation made or imported in contravention of the provisions of this ordinance.

"3. Three printed or lithographed copies of the whole of every book, * * *, which shall be printed or lithographed in the Colony, * * *, shall, within one month after the date on which any such book shall first be delivered out of the press, and notwithstanding any agreement (if the book be published) between the printer and the publisher thereof, be delivered free of any charge, claim, or demand whatsoever by the printer, bound, sewed, or stitched together and upon the best paper on which the same shall be printed or lithographed, to the Colonial Secretary. * * * The Colonial Secretary shall thereupon give a receipt in writing for the copies so received."

It is not argued for plaintiff that the law-making body of Trinidad exercised the power conferred by Section 27 of the British Act to modify the requirement of Section 5 thereof, that a valid assignment of copyright was required to be in writing.

With this understanding of the law, it now becomes necessary to state the material facts.

One Rupert Grant, who was a singer in the Calypso tent operated by the plaintiff, and who used the designation of "Invader" as his platform name, composed the song in question, during the month of February, 1943, in Port of Spain, Trinidad.

The word "Calypso" is of obscure and uncertain origin and seems to have come by no well defined pathway, to be the accepted designation of an institution of uncertain age, made up of native singers and their songs; the former are commentators upon transient events of interest to the natives, and render their observations in lyrical form, embodied in simple melodies which have not changed basically through the years, although there has been some accretion by way of variation. Frequently the hearers join in the singing of the chorus or theme of a given song.

Thus the songs and the singers constitute Calypso, the combination having come to be identified with Trinidad; of recent years audiences have included not only the natives who perhaps lack other means to inform themselves upon contemporaneous events, but visitors to the Island, and others who have become interested in the manners and customs of the inhabitants. The influx of American civilians and members of the armed forces began late in 1941, and grew apace in 1942. It was in the latter year that the "Yankee dollar" began to play an important part in the every-day lives of the people, and the presence in the Calypso tents of many of those who were responsible for its advent also served to widen the audience, and spread the influence of the Calypso singers.

The plaintiff, in whose tent Grant performed, testified that Calypso songs as a rule were first submitted to him, and by him to a board of censors of whom the Commissioner of Police is chairman, before public performance was permitted by him; that such was the case in connection with "Rum and Coca-Cola"; that is, in February of 1943 Grant submitted this proposed song to him on handwritten sheets. That plaintiff mentioned his intention to get out the said booklet, and "* * * he (Grant) wants me to include that in the booklet, so I told him first I have to submit it to the Board of Censors and after they have approved it I will send it to the printer, I will print it, and we will have everything done there, and he agreed".

"Q. What did Mr. Grant say about your right to use the song in the book? A. He said 'You can do whatever you want to with it, you have my permission'.

"Q. Was anything said about what Mr. Grant was to receive? A. Yes, he was to get the profits, whatever the results of the sale of that booklet were, down there in Trinidad.

*     *     *     *     *     *

"He gave me permission to publish the song in the booklet, and the profits of the sale of the book in Trinidad will be divided pro rata according to the songs of each individual or those that are in the book, and he agreed."

Thereafter the plaintiff took this song, then on typed sheets, along with other matter, to the printer. Plaintiff's Exhibit 1 was the result, namely, the booklet in question. On the front cover appears the following:

"Victory
"Calypsoes
"1943
'Souvenir Collection
"Published by
"Lion and Atilla
"Price 50c.

"All Rights Reserved by M. H. Khan."

On the back cover the legend at the bottom is: "Printed by the Caribbee Printerie, 46 Henry St., P. O. S. A. T. Pollonais, Prop; for Victory Calypso Tent, 95 Edward Street, M. H. Khan 1c Norfolk St., Belmont, P. O. S., Trinidad, B. W. I."

Plaintiff's exhibit 2 is a Certificate by the Acting Colonial Secretary, dated March 1, 1943, addressed to the plaintiff, stating that in accordance with the requirements of "Section 3 of Ch. 31 No. 16" the receipt of three copies of "Victory Calypsoes—1943 Souvenir Collection—published by Lion and Atilla" is acknowledged.

That is accepted, together with plaintiff's Exhibit 3, as proof of compliance with the ordinance in question as to the booklet, plaintiff's Exhibit 1.

Khan testified that he did the mailing of the three copies, acting for the printer, and I digress to observe that no time need be wasted in discussing the defendants' contention that the mailing was required to have been done by the printer, himself. Obviously the latter could have accomplished that purpose through any agency that he chose. The important fact is that the copies were filed on behalf of the person charged with responsibility for that task.

To resume as to the arrangement between Grant and the plaintiff:

The former's testimony as to his conversation with Khan is as follows:

"Q. Will you state the conversation you had in Mr. Khan's office? A. We went in Mr. Khan's office, in the front room of his house, and Mr. Khan said, 'Well, Invader, I am very much impressed about that song; all your songs, but I think that is the one for the booklet'.

"Q. Which one? A. Rum and Coca-Cola.

"Q. Then what did you say and what did he say? A. I asked Mr. Khan where do I come in. He said, 'I fill the booklet with the songs'. I said, 'If you put my song in that booklet what would I get?' He then told me, you know, many other singers, about four other singers—Atilla, Lion, Radio and Ruin and myself at the time. 'If I put it in this book you would get a sixth of the profits of it', and he said, 'but under these conditions: you have to give me all rights, because when I am printing the book I am going to put "All Rights Reserved to M. H. Khan".' I asked him, 'Does that jeopardize me and my song?' He said, 'No, it will be mine, but it is for your protection.' He said I have to give him all rights to copyright the song. When he told me it is for my protection, I said, 'All right, Mr. Khan, I will give you all rights to print, copyright and everything'. That was the conversation between us.

\*       \*       \*       \*       \*       \*

"Q. Have you ever given anybody any rights to the use or publication of the song Rum and Coca-Cola, prior to your having given them to Mr. Khan? A. No, I never did give them to nobody."

On cross-examination he said:

"Q. Didn't you show him (Link, the Feist General Manager) the paper so you could convince him you owned the rights to the song? A. I don't own no rights. I convinced him nothing, because I own no rights to the song.

\*       \*       \*       \*       \*       \*

"Q. Did you retain Mr. Ellis to represent you in the matter? A. Yes, sir; I don't remember if I saw this letter.

"Q. But you authorized him to represent you? A. That is right.

"Q. And to make a claim on your behalf? A. Yes, on my behalf.

\*   \*   \*   \*   \*   \*

"The Court: Mr. Witness, I do not know whether you understand these questions or not, and perhaps you do not. Counsel is trying to get you to say you tried to convince him you had the sole interest in this song. Did you try to convince him of that?

"The Witness: I never did, your Honor.

"The Court: Did you try to convince anybody in his presence of that fact?

"The Witness: No, sir. If I told him, I told him I sold Mr. Khan all the rights. That is what I told Mr. Harry Link."

On redirect examination, he said:

"Q. Did you discuss with Mr. Khan whether you would make a new arrangement—a discussion about a new arrangement? A. I told him when we come to America we will have to make a new arrangement regarding the American percentage for the rights."

The next step in the recital is the execution of a document by Grant, in the office of plaintiff's attorney, dated April 16, 1945, being Exhibit 17, as follows:

"Know All Men By These Presents that I, Rupert Grant, of Port of Spain, Trinidad, have heretofore assigned and do, by these presents, assign to Mohamed Khan of Port of Spain, Trinidad, his heirs, executors, administrators and assigns, all my right, title and interest in and to the words and lyrics of a certain song created and written by me entitled 'Rum and Coca Cola' including the right to apply for a copyright thereof in Trinidad, the United States of America and any other country in the world and complete and unrestricted rights of publication, private and public performances and mechanical and electrical reproductions or otherwise.

"The transfer of title to the said song and the rights herein granted are subject to the terms of an agreement defining the respective interests of the undersigned, Mohamed Khan and others in the proceeds of a claim and suit to be brought for infringement of the copyright of the said song obtained by Mohamed Khan in Trinidad. This assignment is an affirmation of a previous oral assignment of said rights to Mohamed Khan but does not, in any way, change or affect the respective interests of the undersigned, Khan and others as expressed in writing in an agreement with Emil K. Ellis, Esq., attorney, of 1270 Sixth Avenue, New York, N. Y.

"In Witness Whereof, I do hereby set my hand and seal this 16th day of April, 1945.

Emil K. Ellis    Rupert Grant"
Witness

The concluding clause has reference to an agreement of retainer of plaintiff's attorney, upon a contingent fee basis, which is defendants' Exhibit J.

The defendants argue that since the verbal assignment from Grant to plaintiff does not constitute a valid assignment of copyright according to the quoted requirements of the British Copyright Act, there was no assignment prior to the 16th of April, 1945, and consequently the plaintiff was not the copyright owner on March 1, 1943, and the registration in Trinidad must be treated as a nullity, which means that the United States registration entirely falls for lack of legal basis to support it.

This argument might be impressive if it could be seen that Grant released his song from copyright protection by singing it in plaintiff's Calypso tent on March 1, 1943, and for a week thereafter; also in many other public places in Trinidad during the ensuing months.

The evidence will not sustain that conclusion. The testimony is convincing that, as between Grant and Khan, there was a clear understanding that the song should enjoy the protection of copyright in Trinidad, and it was publicly rendered on March 1, 1943, the date of the publication and initial sales of the booklet. The words on the cover "All Rights Reserved by M. H. Khan" are consistent only with the restricted nature of the publication which he and Grant stated on the witness stand.

The vogue which the song obtained caused it to be widely taken up and repeated among the populace of Trinidad, but it did not lose its status as a copyrighted song and so enter the public domain in the

sense that Amsterdam who visited the island in September of 1943 was at liberty to lift it therefrom and come back to the United States and there obtain, directly or with others, the right to procure copyright protection for that which he chose to assert was original with him.

The requirement for a written assignment dated March 1, 1943, would be important if Grant were to seek redress from Khan as for copyright infringement prior to April 16, 1945, and the latter were to rely upon the invalidity of the oral assignment; but that is not this case. Here the written instrument of April 16, 1945, is not assailed for inherent incapacity to accomplish the purpose stated in the first paragraph; nor is any reason perceived for failing to accord efficacy to its confirmatory purpose. So far as these defendants are concerned, there is no showing of cause to confine it to prospective operation as of the day it bears date.

The defendants' copyright had long prior thereto been registered, and the sale of copies of their song "Rum and Coca Cola" had attained volume late in 1944 and early in 1945. The defendants' brief states, however, that it was a dead issue by August 10, 1945, when the complaint was filed.

I can see no just reason for deciding the issues in this case upon the theory that it was not open to Grant at any time to confirm in writing so as to meet the requirements of the British statute, that which he said he accomplished on or about March 1, 1943; namely, the assignment of the copyright of his song "Rum and Coca-Cola" to the plaintiff Khan. If this is a sound construction of the evidence, it results that the registration of copyright in Trinidad on March 1, 1943, was adequate to confer upon this plaintiff the status of copyright owner and to support his copyright registration in the United States, as against these defendants.

Clementi v. Walker (1824), 2 Barnewall & Cresswell Reports 861, and In re Jude (1907), 1 Chan.Div. 651, are said to militate against this view. If, in the first, the instrument executed in 1822 by the composer had in terms been in affirmation of his earlier agreement with the plaintiff in 1814, whereby he sought to render the assignment effective as of that date, the point here involved would have been presented for decision; the opinion does not treat of that subject, and apparently the decision is, that since the 1814 publication in England was not that of the composer, the plaintiff acquired no rights until 1822, and the intervening conduct of the defendant in procuring in France a copy of the musical work which the composer had there caused to be published, and then publishing it in England, was "unexceptional"; that is, British interests were promoted thereby.

Why they would not have been equally promoted by the plaintiff's 1814 publication is not discussed. The case is an interesting commentary upon the need for international copyright protection some 123 years ago, but is not dispositive of this controversy.

The second case decides that the agreement relied upon to defeat the composer's copyright did not constitute an assignment to the defendants and their predecessor in title, but rather a license to print and publish a volume or collection of plaintiff's compositions, leaving the copyright in him.

The statutory requirement for a written assignment is too clear for discussion and these cases add nothing to it, for such has been the law of England at least since the Statute of Anne (8 Anne Ch.19). The present issue is merely whether, as between these parties, a written assignment may be deemed to have been established as of March 1, 1943, although not dated until over two years thereafter, where the composer clearly stated that to be his purpose, and both parties acted in accordance with that understanding. In resolving that issue in plaintiff's favor, it would seem that the cause of justice is served, and that the purely statutory rights involved are not attenuated by giving them a strained or unnatural construction.

The plaintiff argues that by implication the Trinidad Ordinance modified the British Copyright Act in respect of the status of an author who is not his own publisher, in that, while under the British statute he

is the first owner of the copyright by virtue of his authorship, and can part with that only by written instrument, in Trinidad the necessary meaning of the Ordinance is that the author does not become entitled to copyright until he publishes, after composing; that before publishing, he can orally assign his inchoate copyright, so to speak, and vest it in another as publisher, which is what Grant must be held to have done here; and that the parol assignment was therefore sufficient in view of this asserted difference between the copyright laws of Great Britain and the Ordinance of Trinidad. In other words, the distinction is said to be clear between the assignment of the right to obtain copyright, and the assignment of a copyright itself once it has come into existence.

Such perhaps is the theory of paragraph 4 of the complaint.

I should suppose that so fundamental a modification as to postpone the creation of copyright from the act of authorship to the act of publication, if intended, would be stated in plain language, and not left to inference arising from Section 3 of the Ordinance, which seems to be addressed to the necessity for filing three copies of a copyrighted work with the Colonial Secretary. Absent such a provision, there would seem to be no public office in which copyrighted works could be deposited or registered. It seems unnecessary to flatly accept or reject this contention, which I do not mean to decide, since the plaintiff's rights are recognized on the ground already stated.

As an alternative theory, the plaintiff also argues, although he does not so plead, that Grant should be deemed to be "in the employment of some other person (Khan) under a contract of service", and that the song in question constituted "work (that) was made in the course of his employment by that person * * *" and that Khan, in the absence of contrary agreement, is the first owner of the copyright, within the purview of Section 5 (1) (b) of the British Copyright Act above quoted.

█ Since the issue was not tendered, and can scarcely be deemed to have been explored in the testimony, it seems hardly to justify determination on the theory that a motion is pending to conform the pleadings to the proof.

Such a cause ought to be separately averred, since if the plaintiff were to prevail on that theory, the necessity for an assignment of the copyright would not be present. It may be that adequate testimony could be adduced to justify the conclusion that the proprietor of a Calypso tent acquires the equivalent of shop-rights in the creations of his singers; that the latter really enter into a "contract of service", not a contract "for services", and that their compositions become part of their employer's stock in trade as distinguished from compositions by the conductor of an orchestra employed by a music-hall proprietor, as in Eaton v. Lake, 20 Law Reports, Queens Bench Div. 378.

The present comment is that the evidence is deemed insufficient, in this case, to grant relief to the plaintiff on this particular theory.

█ The defendants urge that, since the names "Lion and Atilla" appear on the front cover of Exhibit 1, under the words "Published by", they should be parties to the cause as either licensees, or the ostensible copyright owners. That argument ignores the words "All Rights Reserved by M. H. Khan" and the testimony which has been quoted above as to the dealings between Grant as composer and Khan, concerning the copyright.

Nor is it necessary to comment at length upon the statements made by Grant in an interview with Link, General Manager of Feist, which was sought and arranged by him. Grant asserted at that interview that he was the composer of the song, and that statement is accepted as the basis of this decision. Such was the burden of his protests to Link, and Grant's version of what took place was convincing to the Court. The incidents of that interview did not strengthen the defendants' case in my opinion.

The remaining matters of defense are not of impressive dimensions or content.

█ As to the second defense, that the plaintiff's song is inherently "salacious and immoral and lewd", little need be said. The chorus alone is the basis of plaintiff's

**458**

claim, and when it is remembered that it embodies the theme of the song, that which identifies it from other similar creations, the words are not seen to be other than a recital or recognition of a development in the economy of Trinidad which was too important to escape the comment freely circulated in the Calypso shows.

It cannot be seen that there was a purpose to corrupt the morals of hearers, or to stimulate thoughts or impulses which would otherwise be dormant.

■ The defendants submit quotations from numerous opinions, which contain interesting and abstract observations, but no case is cited which factually bears any relation to the matters under scrutiny here. As was said in United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, at page 707: "The question in each case is whether a publication taken as a whole has a libidinous effect."

The uncontradicted testimony of plaintiff's witnesses from among the armed forces in Trinidad does not support this contention of defendants. No comment could illuminate the temerity of this argument, if that is what it is, when certain of the verses of defendants' version of the song are compared with those of the original composition. The capacity to edify intended auditors is certainly no less conspicuous in the plaintiff's song than in the defendants', and considering its origin, the former is entitled to the greater tolerance of appraisal.

■ The third and partial defense is said to rest upon the decision in Corcoran v. Montgomery Ward & Co., 9 Cir., 121 F. 2d 572, certiorari denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550.

The partial defense is stated in this form:

"11. Plaintiff's work having been registered as a book, pursuant to Presidential Proclamation No. 2608, March 14, 1944, 9 F.R. 2839, the only alleged rights in plaintiff's work that could be violated, are in printing, reprinting, publishing, copying and vending, subsequent to March 13, 1945."

The contention in this respect was stated by defendants' attorney (S.M.3): "We say

as this was copyrighted as a book, the only rights it could have as a book were in the publication, printing and vending. Therefore it would have no such rights after the date I have mentioned, under the Presidential Proclamation. * * * under * * * the Corcoran case * * * they held * * * if you publish the lyrics of a song in a book or booklet and you copyright the book * * * the only rights you would have in copyrighting a poem or verses or lyrics of the song, but not the music, would be under subdivision (a), section 1, of the United States Copyright Act [17 U.S.C.A. § 1(a)], to print, reprint, publish, copy and vend a copyrighted work."

The Corcoran case decided that the author of doggerel verse entitled "Plain Bull", which had been copyrighted as a periodical contribution within the classification of "books", could not establish a cause within the statute, against the defendant who "caused the poem to be set to music and is engaged in recording the end product on phonograph records and selling the records to the public". The decision is that the statute, which was amended in light of White-Smith Music Publishing Company v. Apollo Company, 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655, 14 Ann.Cas. 628, had not created such protection of the intellectual conception, as distinguished from its copyrighted embodiment, as to afford a remedy to the plaintiff.

It is not perceived that the decision can restrict this plaintiff's cause so far as the defendants' conduct is concerned in publishing and selling the song as such.

■ The defense of laches creating estoppel requires but brief comment. The testimony is convincing that the plaintiff and Grant did not learn of the probable infringement until about the middle of January, 1945, and arrangements were made as promptly as war-time conditions permitted for them to come to the United States to ascertain the true facts. Grant arrived in New York in March of that year, and a letter was written on his behalf to the defendant Feist on the 23rd of that month. It was sufficient to apprise that defendant that its rights to print and publish the song were in question.

According to the defendants' brief, their song had its vogue between December 11, 1944, and March 31, 1945. The claim of laches is apparently based upon the lapse of time between discovery in mid January of 1945, and the filing of the complaint some seven months later. But that could not have been done until the plaintiff's United States copyright was secured on June 29, 1945, so that forty-two days were allowed to pass until the filing of the complaint. Reliance by the defendants is placed upon Haas v. Leo Feist, Inc., D.C., 234 F. 105, 106.

There the statement of facts discloses that Haas, the plaintiff, recognized the infringement in January of 1915, and consulted a lawyer in March, "who in turn took no action until this suit was brought on the 28th of January, 1916, at which time the song had long since run its course".

The observations in the opinion, 234 F. on page 108, must be understood in light of the facts giving rise thereto, and, so understood, will be found not to avail the defendants here. This plaintiff's legal status was so circumscribed, until he secured the United States Copyright, that the time which elapsed between the establishment of his capacity to sue, and the filing of the complaint, was too short to support the defendants' assertion of laches.

The infringement itself is too plain to justify more than the comparison of the two versions of the chorus or theme of the song "Rum and Coca-Cola" which appear at the outset of this opinion.

Access was completely demonstrated, and the most that can be said for Amsterdam is that, when he visited Trinidad in September of 1943 in his capacity as a public entertainer, he found the song in current and wide-spread use, and therefore deemed himself at liberty to appropriate it to his own repertory. When he returned to the United States he appreciated its probable public appeal, and with the collaboration of Baron and Sullavan put it into such form as would be calculated to yield the largest returns, under the auspices of a well-known music publisher of works of that general type.

If he had frankly avowed the true situation upon the witness stand, his testimony would have been more convincing than it turned out to be.

■ Among the many cases which have been examined at the instance of both attorneys, it may be said that the opinion of Judge Bright in Freudenthal v. Hebrew Publishing Co., D.C., 44 F.Supp. 754, contains in condensed form much helpful comment and citation touching principles which are thought to apply to the facts at bar. There seems to be no case precisely like this in the matters which have been discussed, but the basis of plaintiff's claim for relief involves no innovation so far as the law of copyright under the statute is concerned. The element of intention is not important, as is pointed out in M. Witmark & Sons v. Calloway, D.C., 22 F.2d 412, at page 414.

The defendants seem to argue that the plaintiff has failed to demonstrate that the passage which is relied on is not shown to be a chorus or the theme of the song. Expert opinion to the contrary, I find otherwise from the testimony and by an examination of the composition. No other category of the words in question would be compatible with the song as a whole, in either version, the plaintiff's or the defendants'.

■ It is not thought that a decree for the plaintiff does violence to the principle that ideas, phrases or words as such cannot be the subject of copyright protection; what is here involved is thought to be a unique expression of Grant's concept of a recent phase in the life of natives and residents of Trinidad, as of February, 1943, clothed in a particular form devised and designed by him to adequately express his comments to those who knew most about the subject-matter; the appropriation thereof was deliberate and intentional, and constituted the taking of something which it is the design of the copyright statute to prevent.

■ It does not appear that the nominal recovery of the statutory minimum of $250.00 would be compensatory to the plaintiff, in view of the extent to which the defendants presumably have profited by their violation of his rights; an accounting will therefore be ordered.

Settle decree in accordance with the foregoing.

Findings and conclusions are filed herewith.

In connection with the decision in this cause, the Court makes the following:

### Findings

1. The song "Rum and Coca-Cola", as it appears in the booklet entitled "Victory Calypsoes, 1943 Souvenir Collection", constituting plaintiff's Exhibit 1, was composed and created as to the lyrics and words during February, 1943, by one Rupert Grant, a native of Trinidad, B. W. I., whose platform title was "Invader" and "Lord Invader".

2. The said Rupert Grant, as of about March 1, 1943, duly assigned his copyright in said song, and his right to procure a copyright therefor, to the plaintiff, Mohamed H. Khan (a resident of Trinidad, B. W. I.), in Port of Spain, Trinidad.

3. The said Mohamed H. Khan thereby became the copyright owner of the said song, and duly procured the copyright therefor in Trinidad, B. W. I., on or about March 1, 1943, in accordance with the provisions of the Ordinances of Trinidad thereunto appertaining, and the British Copyright Law of 1911.

4. On or about May 1, 1945, the said plaintiff duly procured from the Copyright Office of the United States of America a Certificate for Ad Interim Copyright of the said booklet, entitled "Class A, Ad. Int. No. 28855".

5. On or about June 29, 1945, the said Mohamed H. Khan, as copyright owner, duly acquired United States copyright covering the said booklet as originally copyrighted in Trinidad; and Certificate of Copyright No. 485,327, on or about that date was duly issued to the plaintiff by the Copyright Office of the United States of America.

6. The plaintiff continued to be the copyright owner of the said booklet until the filing of his complaint herein on August 10, 1946, and until this time.

7. By the said action of the Copyright Office of the United States of America, plaintiff secured the exclusive right and privilege in and to the copyright for the said booklet, and the words and lyrics of the said song "Rum and Coca-Cola" therein contained, in the United States of America, and became and continued to be the sole proprietor thereof.

8. The defendants, Leo Feist, Inc., Paul Baron, Morey Amsterdam and Jeri Sullavan, have infringed the copyright of the said song "Rum and Coca-Cola", without plaintiff's consent and in violation of his rights.

### Conclusions of Law

I. The plaintiff is entitled to a decree against the defendants and each of them, and all persons and corporations acting in concert with them, or under their control, direction, permission or license in any manner whatsoever, directly or indirectly— permanently enjoining and restraining them and each of them from infringing the plaintiff's said copyright of the song "Rum and Coca-Cola" in any manner whatsoever.

II. The plaintiff is entitled to recover from the defendants jointly and severally such damage as has been sustained by him in consequence of the infringement of the said copyright, and to an accounting of all the gains, profits, emoluments and advantages derived by the defendants and each of them from the said infringement, according to the provisions of the Copyright Law; the accounting to be taken and stated by a Master to be appointed by this Court.

III. The defendants and each of them are required to deliver up for destruction all infringing copies and devices and plates and other matter for making such infringing copies.

IV. The plaintiff is entitled to recover the costs of this action, and reasonable counsel fees.

V. The decree is to be settled in accordance herewith and upon notice.