### BARON v. LEO FEIST, Inc., et al.

District Court, S. D. New York.

June 14, 1948.

See also 7 F.R.D. 71.

Phillips, Nizer, Benjamin & Krim, of New York City (Louis Nizer and Paul Martinson, both of New York City, of counsel), for plaintiff.

Julian T. Abeles, of New York City (Julian T. Abeles, Arnold J. Bernstein and Benjamin G. Weil, all of New York City, of counsel), for defendants.

RIFKIND, District Judge.

Maurice Baron, holder of a copyright on a collection of twelve songs entitled "Calypso Songs of the West Indies," of which the song "L'Annee Passee" is one, brings this infringement action against Leo Feist, Inc., Paul Baron, Jeri Sullavan and Morey Amsterdam, alleging that the music of the song "Rum and Coca-Cola," copyrighted and published by Leo Feist, Inc., and allegedly written by Sullavan and Paul Baron, infringes upon "L'Annee Passee."

Every material issue of fact was hotly disputed during the trial of the action and the musical experts for each side demon-

strated, in their zealous partisanship, the doubtful function of the expert as an aid to the court in this class of litigation. Nevertheless, the inherent probabilities of the circumstances and the differing qualities of the testimony made the resolution of most of the issues of fact comparatively easy. The music itself lent itself quite readily to lay analysis and evaluation.

In Port of Spain, Trinidad, in 1906, Lionel Belasco, even then known as one of the foremost composers of the West Indies, composed the music and Creole lyrics of a song he entitled "L'Annee Passee." In the years at the beginning of this century it was Belasco's custom to have certain of his young friends come to his home in Port of Spain for musical gatherings. Belasco was the only member of the group with substantial musical training and he taught his friends the music he had composed, which they would play on such instruments as the guitar and the quatro. Belasco was a pianist. Two of this original group, Minerve and Clark, testified that in 1906 Belasco taught them "L'Annee Passee," a song he said he had just composed; neither had heard the song before that time. Clark corroborated Belasco's identification of other members of this early group, one of whom, named Monrose, died before the institution of this action. Another witness, Dr. Merrick, was also taught the song by Belasco in 1906, and was told by Belasco that he had just composed it. All three were acquainted with the incident that had occurred locally in 1904 or 1905, and which had inspired the lyrics. Another witness, Massie Patterson, remembers hearing Belasco play the tune at her home in Trinidad some time later. All these witnesses impressed the court as credible.

Belasco never made a written copy of "L'Annee Passee" and made no attempt to to publish or copyright it until years later. The only performances the song had, to Belasco's knowledge, were among his friends and at private gatherings.

The only evidence contradictory of the song's stated origin is contained in the de-

position of Philip Garcia, taken on the 28th and 29th of March, 1947, in Trinidad. The pertinent interrogatories are:

"13. Are you familiar with the melody of the musical work entitled 'L'Annee Passee', a photostatic copy of which is annexed hereto * * *? A. Yes.

"14. * * * state for what length of time you have known such melody, and when, where and in what manner and through what sources you have become familiar with such melody. A. I have known this melody since about 1893 when I was a little boy living on Henry Street. It was a popular song of that period."

Garcia's reputation was impeached by some of plaintiff's witnesses. In light of the testimony of Minerve, Clark, Belasco and Merrick, especially with relation to the dating of the local incident, I perceive no reason for discrediting them and giving credence to Garcia's deposition. No other witness heard of the song prior to 1906.

In 1941, Massie Patterson, a professional singer, communicated with Lionel Belasco in New York to acquire Calypso songs [1] to add to her repertory. She knew Belasco as a well-known composer of that kind of music. Belasco complied with Miss Patterson's request and played many of his songs for her. Thereafter, in the Summer of 1942, both went to plaintiff, Maurice Baron, a music publisher, who was interested in publishing that type of music. Mr. Baron made free transcriptions, over a period of time, of some of the songs Patterson and Belasco played and sang for him. A contract was signed in October of 1943, and, after publication on December 31, 1943, a copyright was secured in January of 1944 for the collection referred to—"Calypso Songs of the West Indies"—with Creole and English lyrics. The copyright application listed Maurice Baron as the arranger-transcriber, Patterson and Belasco as collectors of the Creole lyrics. The published copy bears on its cover the inscription "Calypso Songs of the West Indies by Massie Patterson and Lionel Belasco. Free Transcription by Maurice Baron." To Belasco's knowledge this was

---

[1] A Calypso song is a song distinguished by a certain form, rhythm, and narrative style, apparently indigenous to the Island of Trinidad.

the first publication and copyright of plaintiff's song.

Between December, 1942 and January, 1943 Rupert Westmore Grant, a professional Calypso singer, composed the words of a Calypso song entitled "Rum and Coca Cola." This lyric was copyrighted in Trinidad, in February of 1943. Grant began to sing the song publicly in March of 1943, to a tune, he says, he learned in November, 1942 from Cyril Monrose, a cousin of Belasco, and one of the men identified by other witnesses as a member of Belasco's early group of friends. Grant said Monrose played and sang a song for him called "L'Annee Passee", and Grant now identified both the melody and the lyrics as plaintiff's song. Grant testified that he changed a few notes in the final phrase of the melody befor adapting it to his lyrics.

"Rum and Coca Cola", at least in part, was a ribald comment upon the social interrelationship existing between the American soldiers stationed in Trinidad and the natives. It became an overnight success and was sung a great deal by both natives and soldiers. A number of soldiers who had been stationed in Trinidad during this period testified to the tune's extreme popularity and identified the words and music as virtually identical with defendants' published composition. Grant attributed his failure to copyright the music to his belief that it belonged to Belasco. On cross-examination Grant admitted having heard a recording of a song entitled "Man Smart Woman Smarter" before composing "Rum and Coca Cola." Some witnesses testified to a similarity between the music of that song and "Rum and Coca Cola."

No other testimony than Grant's was given as to the origin of the melody he used for his song, "Rum and Coca Cola", except that defendants, by the introduction of many other songs, have attempted to show that the melody was a common one. None of these songs was as similar to "Rum and Coca Cola" as plaintiff's song, and Grant's testimony as to the source of the melody went unimpeached. For reasons hereafter to be stated, the existence of these other songs can have a bearing only on Grant's credibility. I find that it has not been successfully impeached. It has been established to my satisfaction that the melody of "L'Annee Passee" was the one sung in Trinidad.

In September of 1943 defendant Morey Amsterdam arrived in Trinidad as an entertainer for the U.S.O. He stayed about a month, during a period when, according to uncontradicted credible testimony, "Rum and Coca Cola" was at the peak of its popularity. Amsterdam claims never to have heard the song, except that on one occasion he heard one soldier sing the words "Rum and Coca Cola kill the Yankee soldier" to a tune resembling in structure "It Ain't Gonna Rain No More." Amsterdam said he subsequently wrote lyrics of his his own and, as part of his program, sang them to a tune resembling in structure, "It Ain't Gonna Rain No More."

Upon his return to the United States he offered the lyrics to defendant Jeri Sullavan, who was to appear as a singer in a New York night club. The testimony of Amsterdam and defendant Paul Baron, alleged co-author of the accused music, concerning the writing of the music, is replete with contradictions and improbabilities. In any event, their final position is that Amsterdam told Miss Sullavan that he had been singing the lyrics to the tune "It Ain't Gonna Rain No More." She, in turn, relayed that information to Paul Baron when she asked the latter to write the music for the lyrics. Baron thereupon wrote the music, as published, of "Rum and Coca Cola." Amsterdam, they assert, never met Baron until after Miss Sullavan's rendition of the song at the night club met with resounding success. At some point after that event, which assured the song a successful career, Baron asked Amsterdam for a demonstration of how the latter had sung the song in Trinidad, to make sure that the accents of Baron's composition were correct. Amsterdam thereupon gave an "unable" demonstration of the tune "It Ain't Gonna Rain No More", to which Baron paid scant attention, being by then assured that the accents were correct.

Paul Baron testified that his inspiration for the song had come from two strains he had in his head. One was a Spanish melody entitled "Si Formas Tuvieran Mis

Pensamientos" and the other was a Calypso entitled "King Jaja" The court is satisfied that the Spanish melody has no significant similarity to "Rum and Coca Cola." When Mr. Baron's original deposition was taken, "King Jaja" was not mentioned; it was added at the time he signed it, some months later. Baron claims he heard "King Jaja" sung many times in this country, and has seen the music. He places the time in the late thirties, but has no recollection of where he saw the music nor in what form it was written; he has no recollection of where he heard the music nor who sang it. No other witness at the trial had ever heard "King Jaja" in this country.

Popular music is a field where professional reputation is of utmost importance, and the practice is to split royalties equally between composer of music and author of lyric. The first copyright application, in September, 1944, listed Amsterdam as sole author of words and music; the first contract between Feist, Amsterdam and Baron, dated October 18, 1944, provided that Amsterdam receive two-thirds of the royalties, and that Baron receive no credit as composer. The first 200,000 recordings of "Rum and Coca Cola" made by the Andrews Sisters carried labels identifying Amsterdam as composer of both words and music, making no mention of Baron. After Sullavan and Paul Baron consulted a lawyer, the nature of which consultation Baron cannot recall, a new contract dated December 14, 1944, split the royalties three ways, among the three individual defendants, and thereafter Miss Sullavan and Baron were credited and listed as co-authors of the music, Amsterdam as author of lyric.

Five copies of plaintiff's "Calypso Songs of the West Indies" were in the library of the Columbia Broadcasting System's New York office during the time Baron allegedly wrote the music of "Rum and Coca Cola"; Baron was at that time employed by that company and frequently made use of the library.

The accused song bears the kind of similarity to plaintiff's song which, by standards set up by the Court of Appeals of this Circuit indicates internal evidence of copying even in the absence of proof of access. Heim v. Universal Pictures Co., 2 Cir., 1946, 154 F.2d 480; Hein v. Harris, D.C.S.D.N.Y., 1910, 175 F. 875, Affirmed, 2 Cir., 183 F. 107. The uninterrupted sequence of identical notes is too great to admit of any other inference but copying. The rhythm, construction and the harmony of both songs are little short of identical. To the lay ear substantial identity is the only inference.[2] See Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464. As further evidence of copying, the first copyrighted version of defendant's song (which is not the accused song), bears even greater correspondence to "L'Annee Passee", the chief difference being in the final phrase of the verse, which is the phrase Grant said he changed.

Further exploration of the evidence is unnecessary. There is no doubt in my mind that Amsterdam brought both the words and the music with him from Trinidad, and it was in substantially that form that defendants' song was published. Baron's claim to authorship of the composition is a fabrication.

Mohamed Khan, holder of the copyright on Grant's lyrics has already prosecuted a successful infringement action against Leo Feist, Inc., for plagiarism of the lyric of "Rum and Coca Cola." Kahn v. Leo Feist, Inc., S.D.N.Y., 1947, 70 F.Supp. 450, affirmed 2 Cir., 165 F.2d 188.

In 1944, after publication of plaintiff's book but before publication of defendants' song, Belasco visited the office of Harry Link, an employee of Leo Feist, Inc. in charge of accepting songs for publication, on business unconnected with the issues in this case. On that occasion Link started to play for Belasco a recording of "Rum and Coca Cola." Belasco asserted that the song was his, and finished it on the piano, playing "L'Annee Passee." There is little dispute as to these facts. Link testified that he then asked Belasco for proof and waited in vain; Belasco never reappeared with the proof Link wanted. Belasco, cor-

---

[2] This identity exists between the verse of "L'Annee Passee" and the verse of "Rum and Coca Cola", the only parts of such song in issue. Testimony established that the chorus of "Rum and Coca Cola" is merely an obligato of the verse.

roborated by the testimony of Leighla Whipper, with whose collaboration Belasco had a later collection of songs published, testified that on numerous later occasions he, in her company, attempted unsuccessfully to see Link, but never found him available. Link never attempted, on his own, to get in touch with Belasco, but proceeded to have the accused song published, advising neither Paul Baron nor Amsterdam of Belasco's claim.

■ The defendants have made an earnest effort to show that the song entitled "King Jaja" which bears a strong resemblance to "L'Annee Passee", is a popular folk tune of the West Indies. I have concluded that Paul Baron never knew of that song, and that in fact the music of defendants' "Rum and Coca Cola" was copied from the song of the same name popular in Trinidad. Whether "King Jaja" is part of the public domain can have no bearing, therefore, except as it might throw doubt upon Belasco's authorship of "L'Annee Passee." See Fred Fisher, Inc. v. Dillingham, D.C.S.D.N.Y., 1924, 298 F. 145. But I find that it does not. Even assuming that Belasco's work is similar to "King Jaja", and that the latter is authentic, I am satisfied that "L'Annee Passee" is Belasco's original work and that Baron had no access to "King Jaja." In these circumstances the existence of similar songs, whether in the public domain or not, is no defense to an infringement suit. It is immaterial that other songs are similar unless it casts doubt upon the originality (copyrightability) of plaintiff's song or upon the fact that defendant copied plaintiff's song. Both these issues having been established to the court's satisfaction, "King Jaja" or any other song showing similarity to defendant's or plaintiff's song, becomes unimportant. Detective Comics, Inc. v. Bruns Publications, Inc., 2 Cir., 1940, 111 F.2d 432; Hartfield v. Peterson, 2 Cir., 1937, 91 F.2d 998; Wilkie v. Santly Bros., Inc., 2 Cir., 1937, 91 F.2d 978, affirmed on reargument, 2 Cir., 1938, 94 F.2d 1023; Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1936, 81 F.2d 49, certiorari denied 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392.

Even if "King Jaja" were crucial, its authenticity is doubtful. The only extant form of the song is in a booklet entitled "Land of the Calypso", written by Charles Espinet and Harry Pitts and published in Trinidad in 1944. Neither Pitts nor Espinet were shown to have the kind of musical background a study of this kind would require. Pitts, in a deposition dated February 13, 1947 asserts that records of the booklet's sale had long since been destroyed. Although Pitts, in his deposition, did not include "King Jaja" among what he considers to be the ten foremost Calypsos, its music, along with only two other songs, was printed in his booklet. The testimony of defendants' witnesses who claim to have heard "King Jaja" in the 1930's in Barbados, but cannot identify which of their friends sang it, is not impressive. Both Dr. Merrick an outstanding expert on Calypso music, and Clark testified that they were acquainted with "King Jaja" but that it has always been known to them as a monotone chant, completely devoid of any melody.

The lack of specificity regarding the origin of this song, and the equivocal testimony of those who claim to know it cast grave doubt upon its authenticity. No witness testified to hearing the song before 1906. There is ample ground, for the reasons discussed, to disregard the existence of this song.

■ Defendants realize the weakness of their case based upon the theory that Paul Baron wrote an original song, and so have attempted to defeat the action by predicating their defense upon the proposition that the music of "L'Annee Passee" was not original with Balasco but was part of the public domain, that Maurice Baron's copyright protects only his particular arrangement of the melody. This defense is entitled to succeed only if the melody as introduced by Grant, and sung in Trinidad, may be said to be in the public domain, since the facts show that this is the source of defendant's song. The protracted and argumentative testimony concerning the behavior of Trinidad Calypso singers was of little help. The defense contended that although Calypso singers in their competitive calling never pirated lyrics from each other, they all drew on a common fund of folk melodies to which all felt equally

free to set their lyrics. The plaintiff claimed that melody was as inviolate as lyric, and that each composed his own music. But the general practice, whatever it may be, is not determinative. Concerning the melody of "L'Annee Passee" itself, there has been much testimony that the melody was unknown before Belasco wrote it. It has not been shown that any of the other songs in evidence bears as great a similarity to "L'Annee Passee" as "Rum and Coca Cola" nor that any antedated 1906. Belasco has never authorized or condoned the publication of his song or its plagiarism. It has been admitted on trial that Paul Baron did not copy or derive inspiration from any of these songs (save "King Jaja," which I have discounted), and even if he did, copying from an unauthorized copy is no defense to an infringement suit. Gilmore v. Anderson, C.C., S.D.N.Y., 1889, 38 F. 846. Further, there is the testimony of Grant that he consciously used Belasco's song. None of this testimony in any way categorizes Belasco's song as in the public domain.

Nor does the length of time elapsing between the composition and the copyrighting of Belasco's song destroy his exclusive rights in it. There is no limit to the time a common law copyright may run, unless an act of dedication destroys it, 17 U.S.C.A. § 2 and annotations thereunder. That the law of Trinidad, where the song was written, does not differ from American law on the point, is not controverted. There has been no dedication in the case at bar. When "L'Annee Passee" was copyrighted in 1944 Belasco's previously existing common law right was transformed into Baron's statutory one, and there is no reason why it should not be protected. See, generally, Amdur, Copyright Law and Practice, Chap. II.

Thus far it has been established that Belasco wrote a song which defendants copied from one who knowingly used it. If that song was validly copyrighted by plaintiff, plaintiff must recover.

Defendants have cited the form of plaintiff's application for copyright, the form of the Certificate of Registration itself, and the "Foreword" included in the collection, "Calypso Songs of the West Indies", as indicative, first, of the fact that plaintiff's song was understood by Maurice Baron, Belasco, and Miss Patterson to be, and that in fact it was, a song in the public domain, and second, of a limitation of the copyright protection to Maurice Baron's individual arrangement and not to the basic melody.

On the first point, the testimony has convinced the court that the principals to the contract understood, and that in fact "L'Annee Passee" was, an original composition of Belasco. (Credit for co-authorship was understandably given Miss Patterson for her suggestions, her arranging of the interview with Maurice Baron, her translation of the Creole lyric, her work in the preparation, and her promised public rendition of the songs.) The first two paragraphs of the "Foreword":

"The editor wishes to make acknowledgment to Miss Massie Patterson and Mr. Lionel Belasco, collectors of these authentic 'Calypso' songs from the lips of the Lesser Antilles natives; * * *

"These songs, though emanating from various parts of the West Indies, are, nevertheless, familiar to the natives of Trinidad, Barbados, Martinique, Guadeloupe, Santa Lucia, etc."
are satisfactorily explained by the commercial desirability of designating songs of this nature as authentic. In addition, there was considerable testimony that it was only about Belasco's time, and largely through his efforts, that this kind of song actually became the music of these islands. No conflict was therefore shown between Belasco's authorship of the song and its authenticity as a native song. In the booklet itself each song bears the legend "A 'Calypso' by Massie Patterson and Lionel Belasco." There was ample credible testimony that at all stages of preparation of the collection and arrangement of the contract all the songs were recognized by the parties to the contract as original melodies composed by Lionel Belasco.

The application for registration was submitted by Maurice Baron on Form E, reserved for original musical compositions.

But in the blank left for the name of composer the word "composer" was stricken, "arranger-transcriber" substituted, and Maurice Baron's name inserted in the blank. In the blank left for "author of words" is the inscription "Creole lyrics collected by Massie Patterson (U. S. A.) and Lionel Belasco (Trinidad, B. W. I.)— English version by Olga Paul (U. S. A.)." The Certificate of Registration bears substantially the same listing of credits.

If the copyright application and certificate had designated Belasco the author of the song here in issue, judgment on all the evidence would go to plaintiff, since the evidence bears out Belasco's authorship and defendants' copying. I do not consider these documents sufficiently persuasive, under the circumstances, to negate that authorship. Only if in some way they estop plaintiff from asserting such authorship, or by their nature limit the rights now asserted can these documents affect the disposition of the case.

■■■ While there is language in the rules of the Register of Copyrights indicating the desirability of naming the author of a work, the language is clearly not mandatory. Rules 31 and 32, 17 U.S.C.A. following section 53;[3] Amdur, supra, p. 435. It is true that neither the certificate nor the application designates Belasco the author of the music; but no author at all is designated, nor is there any requirement that there be one named. Since there is no requirement that the name of the author be included in a copyright application, and since neither the certificate nor the application characterizes the collection of songs as public domain material, the only force of the use of such terms as "arranger-composer" and "Creole lyrics collected by" could have is as a rebuttable basis for a factual inference of unoriginality. In the light of the other evidence, already discussed, this inference cannot be drawn. § 55 of the Copyright Act, 17 U.S.C.A. § 55, provides that the certificate of copyright registration "shall be admitted in any court as prima facie evidence of the facts stated therein". Such fact may, therefore, be controverted by plaintiff, it would seem, no less than by defendant, especially when the words therein are relied upon to defeat the claim of valid copyright. Nothing in the Act nor in any authority pointed out by defendants suggests that the characterization of Maurice Baron as the arranger-composer may estop plaintiff from proving the originality of the composition. The courts, in their interpretations of the requirements of the Copyright Act, have shown a tendency to deal liberally with those thought entitled to its protection, in accordance with the broad purpose of that legislation, Washingtonian Pub. Co. v. Pearson, 1939, 306 U. S. 30, 59 S.Ct. 397, 83 L.Ed. 470; United States v. Backer, 2 Cir., 1943, 134 F.2d 533; Campbell v. Wireback, 4 Cir., 1920, 269 F. 372; Patterson v. J. S. Oglivie Pub. Co., C.C., S.D.N.Y., 1902, 119 F. 451.

In any event I should hesitate to insist on a rigorous adherence to form in light of the defendants' position. There has been no assertion that defendants were misled by plaintiff's certificate, nor was there any contention that they believed their published and copyrighted song to be an arrangement of a public domain melody. On the contrary, the contended, in the face of overwhelming evidence of copying, that the song was original with Paul Baron, and made no attempt to investigate the claim made by Belasco before publication that the song was his.

■■■ The evidence clearly establishes infringement of plaintiff's copyright, and judgment must go for plaintiff. Reference will be had to a master on the issue of damages.

---

[3] References are to the Copyright Act before the 1947 codification, since all rights in this case matured before 1947.