TEMPO MUSIC, INC., Plaintiff,

v.

FAMOUS MUSIC CORPORATION and Mercer Ellington, Defendants/Third-Party Plaintiffs,

v.

Gregory A. MORRIS, as Executor of the Estate of Billy Strayhorn, Third-Party Defendant.

No. 90 Civ. 5121 (LBS).

United States District Court, S.D. New York.

Dec. 16, 1993.

As Amended Dec. 17, 1993 and Jan. 14, 1994.

Silverman & Shulman, New York City (Alan L. Shulman, of counsel), for defendants/third-party plaintiffs.

Abeles Clark & Osterberg, New York City (Stuart Prager, of counsel), for third-party defendant.

## OPINION

SAND, District Judge.

Third-party plaintiffs, Famous Music Corporation and Mercer Ellington (collectively "the Ellington Estate"), filed a third-party complaint against third-party defendant, Gregory A. Morris, executor of the Billy Strayhorn estate ("the Strayhorn Estate") claiming copyright ownership of and entitlement to royalties from particular versions of the jazz classic, Satin Doll. This Court has ancillary jurisdiction over the third-party claim by virtue of the fact that federal jurisdiction exists over the original action, predicated under the federal copyright laws. Settlement has been reached on many of the other claims in this litigation, including those claims raised by Tempo Music, Inc. ("Tempo"), the plaintiff in the original action, against defendants/third-party plaintiffs, Famous and Mercer Ellington.[1] What remains in dispute is whether Billy Strayhorn's estate has an interest in the harmony and revised melody of Satin Doll when used or performed *without* the lyrics.[2]

In cross-motions for summary judgment, the parties have asked the Court to resolve an issue of first impression: whether a harmony added to an earlier work can, as a matter of law, be the subject of copyright. The Strayhorn Estate moves for partial summary judgment, seeking an order declaring that Strayhorn's heirs are entitled to one-third of all royalties and other compensation paid, payable and to become payable with respect to the harmony and revised melody. The Ellington Estate cross-moves, seeking an order declaring that as a matter of law, the Strayhorn Estate does not have any interest in any version of Satin Doll when used or performed without the lyrics. Additionally, the Strayhorn Estate moves to strike portions of an affidavit submitted by an ex-

pert for the Ellington Estate in opposition to Strayhorn's summary judgment motion. For the reasons stated below, each of the motions is denied.

## BACKGROUND

At the center of this controversy between the heirs of two of America's most well-known composers is the harmony and revised melody of the jazz standard, Satin Doll, as embodied in two particular versions of the work, copyrighted in 1958 and 1960. Four separate embodiments of Satin Doll define the boundaries of the dispute. The first embodiment is an instrumental version ("IW1") containing only the unpublished melody of Satin Doll as represented by a certified copy of the musical "lead sheet" deposited with the United States Copyright Office, corresponding to copyright registration No. Eu 320603, dated June 19, 1953. Although the Strayhorn Estate disputes the Ellington Estate's allegation that they are sole proprietors of IW1, the allegation is conceded to be true for purposes of this motion. The second version is also an instrumental version ("IW2") but contains harmony and a revised melody as embodied in a sound recording first released and distributed on phonorecord allegedly in or about June 1953 (Capitol Records number 2458) and performed by Duke Ellington and His Famous Orchestra throughout the country.

The third embodiment, a version of the work containing harmony and a revised melody with lyrics, is a derivative work ("DW1") represented by a handwritten piano-vocal score deposited with the United States Copyright Office, corresponding to copyright registration No. Eu 549089, dated November 4, 1958. The fourth version, containing an introduction in addition to the harmony, revised melody and lyrics of Satin Doll, is a published edition of the derivative work ("DW2") represented by a piano-vocal score deposited with the United States Copyright Office, corresponding to copyright registration No. Ep 144736, dated May 20, 1960.

---

1. Tempo Music has been run by Duke Ellington's sister, Ruth Ellington Boatwright, for the last 52 years. Mercer Ellington is Duke Ellington's only child (the father having died in 1974).

2. It is undisputed that Strayhorn's heirs have an interest in the work when used or performed *with* the lyrics.

The question at the heart of the various motions is whether, as a matter of law, the Strayhorn Estate is entitled to an interest in the derivative works, DW1 and DW2, when used or performed without the lyrics.[3]

## DISCUSSION

Resolution of the motions turns on two legal questions. The first question is: does a genuine issue of material fact exist concerning whether the harmony and revised melody are included within the scope of the copyrights in the Derivative Works? The second question is: assuming the copyrights do in fact extend to the harmony and revised melody, does a genuine issue of material fact exist regarding the validity of copyrighting this subject matter? This second question involves an issue of first impression—whether a harmony added to an earlier work can, as a matter of law, be the subject of copyright.

### The Standard of Review

Summary judgment is appropriate where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and the court must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

The Court's role in such a context is not to resolve disputed factual issues, but rather to determine whether the record, tak-en as a whole, supports any issues that require a trial.[4] *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Nevertheless, the very language of the summary judgment standard provides that "the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). Materiality is determined by reference to the substantive law applicable to the case at hand, and factual disputes irrelevant to its outcome "will not be counted." *Id.* at 248, 106 S.Ct. at 2510.

## I. *The Scope of the Copyrights*

In determining whether Strayhorn's heirs have an interest in the harmony and revised melody of Satin Doll, the threshold issue which must be resolved is the scope of the copyrights in the Derivative Works. This portion of the dispute concerns whether the harmony and revised melody are within the scope of the copyrighted derivative material, and if so whether it can be said that Strayhorn collaborated in their creation, as a matter of law.

According to Section 209 of the Copyright Act of 1909, the registration certificate issued by the Copyright Office "shall be admitted in any court as prima facie evidence of the facts stated therein." 17 U.S.C. § 209 (codified in 1947).[5] *See also Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 n. 1 (2d Cir.1977); *Plymouth Music Co. and*

---

3. Because there is very little difference between DW1 and DW2 other than the introduction in DW2, they will be considered together as the "Derivative Works" for the purposes of this motion.

4. At oral argument, the Court suggested that since persons who might otherwise testify are deceased, there is heavy reliance on documents and the Court will in any event be the ultimate finder of fact, trial on a stipulated record might be a more satisfactory means of resolving this controversy, or at least some aspects of it, than cross-motions for summary judgment. The suggestion was rejected. Transcript, April 8, 1993, at 42–43.

5. The Copyright Act was revised in its entirety by Pub.L. 94–553, Oct. 19, 1976, 90 Stat. 2541 which provides: "This Act ... becomes effective on January 1, 1978, except as otherwise expressly provided by this Act...." Section 112 of Pub.L. 94–553 provides: "All causes of action that arose under Title 17 before January 1, 1978, shall be governed by Title 17 as it existed when the cause of action arose." Accordingly, the prior law governs this action. *See Plymouth Music Co. and Roncom Music Co. v. Magnus Organ Corp., et al.,* 456 F.Supp. 676, 676 n. 1 (S.D.N.Y.1978) (applying prior law).

*Roncom Music Co. v. Magnus Organ Corp., et al.,* 456 F.Supp. 676, 679 (S.D.N.Y.1978) (certificate admitted as prima facie evidence). Therefore, the Court turns to an examination of the copyright registration certificates in the instant dispute.

The registration and renewal certificates for DW1 and DW2 provide conflicting information. On the one hand, the registration certificate for DW1 filed by Tempo Music, under the instruction "give a brief general statement of the nature of the new matter in this version[,]" contains only the response, "Lyrics". Shulman Aff., Ex. 2. Billy Strayhorn and Johnny Mercer are listed as authors of the words, but only Duke Ellington is listed as the author of the music. *Id.* Moreover, the renewal certificate only contains the response, "NM: W", under the instruction "RENEWABLE MATTER:", presumably indicating that only the words constitute the renewable matter. Shulman Aff., Ex. 3. Further down on the renewal registration, in the section listing "author(s) of renewable matter:", the certificate states, "W Billy Strayhorn & Johnny Mercer" followed by "M Duke Ellington" with a line through it, apparently to cancel the reference to Ellington.

On the other hand, the registration certificate for DW2 also filed by Tempo Music contains no response under the instruction, "give a brief, general statement of the nature of any substantial new matter in this version[.]" Prager Aff., Ex.N. In contrast to the DW1 registration, the DW2 certificate lists both Duke Ellington and Billy Strayhorn as authors of the music, and only Johnny Mercer as the lyricist. *Id.* Furthermore, a registration certificate filed by Tempo Music in 1964 for an arrangement of Satin Doll not at issue in this motion also lists Strayhorn as the author of the music in addition to Ellington. These inconsistencies create a genuine issue of material fact and preclude summary judgment on this ground.

Other evidence further obscures the issue of authorship, making summary judgment inappropriate. A contract assigning certain rights to Tempo and signed by Ellington, Strayhorn and Mercer in 1954 specified that each of the three musicians were entitled to receive a one-third share of the royalties accruing to Satin Doll, "including the title, words and music thereof." Prager Aff., Ex.P. The Amended Complaint of Plaintiff Tempo Music states, "The Instrumental Work was composed by DE [Duke Ellington] and the late Billy Strayhorn," ¶ 9, and "[t]he Derivative Work was the same as the Instrumental Work except for the addition of lyrics written by Johnny Mercer." ¶ 10. Also, the piano-vocal scores deposited with the U.S. Copyright Office corresponding to DW1 and DW2 list both Ellington and Strayhorn as authors of the music, Shulman Aff., Exs.9 & 10, as do numerous other published copies of Satin Doll. Prager Aff., Exs.Q–W (published copies of Satin Doll listing both Ellington and Strayhorn as authors of music). In this sense, this case is similar to *Baron v. Leo Feist,* 78 F.Supp. 686, 687 (S.D.N.Y.1948), *aff'd,* 173 F.2d 288 (2d Cir.1949) (copyright infringement case involving Calypso song), in which the district court looked beyond the registration certificate to a published copy of the music offering a clearer interpretation of authorship.

When the evidence suggests that the registration certificates may be "defective in form", *Baron,* 173 F.2d 288, 290 (2d Cir. 1949), a court should "hesitate to insist on a rigorous adherence to form." *Baron,* 78 F.Supp. 686, 692 (S.D.N.Y.1948). Moreover, both parties are estopped from claiming they relied on definitive representations made in the certificates regarding authorship of the music without the lyrics. *Id.* (suggesting estoppel as a grounds for precluding a claim to authorship, but finding nothing in record indicating plaintiff should be estopped from asserting authorship). Unlike the situation in *Baron,* a clear shared understanding of authorship is lacking from the affidavits submitted for the instant motion. Both parties had constructive notice of the conflicting representations of authorship. *See,* 2 Nimmer on Copyright § 7.16[E] (1993) (registration as a condition to constructive notice). Furthermore, some of the parties to this action had actual notice of these conflicting representations. *See, e.g.,* Shulman Aff., Ex. 4 (form letter sent to the Executor of the Strayhorn Estate from its agent, the Song-

writers Guild, listing copyright renewals and representing Duke Ellington as the sole author of the DW1 version of Satin Doll); Shulman Reply Aff., Ex. 16 (letter dated May 28, 1964 from Copyright Office to Benjamin Starr, then-attorney for Tempo, explaining that despite inconsistency between DW1 and DW2 with regard to their representations of authorship, Copyright Office would not change the certificate for DW2, which listed both Strayhorn and Ellington as authors of the music).

The existence of a genuine issue of material fact regarding the scope of the copyright in the Derivative Works precludes summary judgment on this ground. At trial it will be necessary to adduce evidence reflecting the intent and past practices of the parties.[6] This approach is consistent with the one followed by the district court in *Baron v. Leo Feist*, 78 F.Supp. 686 (1948), *aff'd*, 173 F.2d 288 (1949). If it turns out at trial that the copyright in the Derivative Works does not extend to new musical material offered by the harmony and revised melody, then the Strayhorn Estate has no interest in Satin Doll when it is used or performed without lyrics. If, on the other hand, it appears the copyright in the Derivative Works does extend to new musical material, and that Strayhorn collaborated in their creation, then there still remains the issue of the validity of a copyright in the harmony and revised melody.

## II.  *Validity of the Copyrights*

■ A Copyright Office certificate of registration "constitutes prima facie evidence of the validity of the copyright" in addition to being admitted in a court as prima facie evidence of the facts stated therein.  17 U.S.C. § 410(c) (Copyright Act of 1976); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092, n. 1 (2d Cir.1977); *Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) (certificate given same effect under 1909 Copyright Act). It is clear, however, that a certificate of registration creates a *rebuttable* presumption of copyright validity. *Durham Industries Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980). "Where other evidence in the record casts doubt on the question, validity will not be assumed." *Id.*

■ In determining the validity of the copyrights in the Derivative Works, the Court is required to resolve a question of first impression—whether a harmony added to an earlier work can, as a matter of law, be the subject of copyright. If, in fact, this material can be the subject of copyright, we will inquire further to see if sufficient originality is present to support a valid copyright. *See Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 347 & 348, 111 S.Ct. 1282, 1288 & 1289, 113 L.Ed.2d 358, 370 & 371 (1991) (originality "remains the sine qua non of copyright protection"; "bedrock principle of copyright").

### A.  *Harmony*[7] *in a Derivative Work is Capable of Being Copyrightable Subject Matter*

Harmony is a derivative creation almost by definition. A composer generally creates a harmony to accompany a particular melody, as opposed to developing harmony in the abstract. That a particular work is a derivative work,[8] such as the versions of Satin Doll

---

6. Relevant to the intent of the parties will be the claim of the Executor of the Strayhorn Estate that "[d]uring Duke Ellington's lifetime, plaintiff Tempo Music, Inc., which then was, and continues to be operated by Duke's sister, Ruth, always paid royalties to Billy Strayhorn or his heirs as a co-author of the music of Satin Doll[.]" Strayhorn Estate Reply Memo. at 5–6.

7. There is a one note variation between the original and revised melody. The Ellington Estate alleges that the one note variation is the result of a typographical error. In any event, the Court finds that the originality of the revised melody is too insubstantial to warrant copyright protection. As with the addition of alto notes in *Cooper v.*

*James*, 213 F. 871 (N.D.Ga.1914), a one note variation from a C natural to a C flat, "can hardly be said to be an original composition." *Id.* at 871. Therefore, we focus only on harmony in this section.

8. Section 101 of the revised Copyright Act (1976) defines a derivative work as one "based upon one or more preexisting works ...." Specifically included in this definition is a "musical arrangement ... or any other form in which a work may be recast, transformed, or adapted." The statute expands upon the definition by saying, "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of

in dispute, is, of course, no bar to copyrightability. Derivative works are explicitly included in the subject matter of copyright by the 1909 Copyright Act. 17 U.S.C. § 7.[9] However, this principle is subject to two important limitations. *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir.1980). The Second Circuit explained these two limitations as follows:

> First, to support a copyright the original aspects of a derivative work must be more than trivial. Second, the scope of protection afforded a derivative work must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material.

*Id. See also* 17 U.S.C. § 7.[10] Therefore, the only aspects of DW1 and DW2 entitled to copyright protection are the non-trivial, original aspects contributed by the authors or creators of these derivative works. *Durham,* 630 F.2d at 909.

■ The Ellington Estate has argued, in effect, that harmony can never be the subject of copyright, contending that "harmony is in the common musical vocabulary; only the melody and structure are distinctively original." Ellington Memo. at 8. Harmony, it is claimed, "results only from the formulaic application of centuries-old compositional rules" such as the use of secondary dominants. Ellington Reply Memo. at 8. The Court is not convinced that harmony is unprotectable as a matter of law. While we agree that melody generally implies a limited range of chords which can accompany it, a composer may exercise creativity in selecting among these chords. As Strayhorn's expert notes, the choice of chords influences "the mood, feel and sound of a piece." Cass Aff. at 6. Creating a harmony may, but need not, be merely a mechanical by-product of melody. A

composer may chose to respond to the tension created by a dissonance by resolving it to a consonance in accordance with "pre-established rules that have been accepted since the 17th century" and that have formed "the basis of ... Western music" Finell Aff. at 5 & 7. However, in contemporary music, and particularly in the jazz music genre, musicians frequently move beyond traditional rules to create a range of dissonant and innovative sounds. Even the expert for the Ellington Estate notes that "Ellington adds a jazz flavor to his chords, and sometimes departs from classic secondary dominants[.]" Finell Aff. at 8.

The choice of one particular harmonic relationship, such as the selection of secondary dominants in Satin Doll, could be considered a creative choice. We reject the third-party plaintiff's argument that "the proper focus in determining originality is not whether [the composer] exercised 'creative choices,' but on the *result* of those choices." Ellington Reply Memo. at 9 (emphasis in original). This emphasis on novelty and uniqueness of a *resulting* work is misplaced. *See, e.g., Feist Publications v. Rural Telephone Service,* 499 U.S. 340, 345, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358, 369 (1991) ("Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying"); *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905 (2d Cir.1980) ("Although novelty, uniqueness and ingenuity are not required, independent creation is"); *Plymouth Music Co. v. Magnus Organ Corp., et al.,* 456 F.Supp. 676, 679 (S.D.N.Y.1978) (quoting *Northern Music Corp. v. King Record Distributing Co.,* 105 F.Supp. 393, 399 (S.D.N.Y.1952)) (" 'One requisite to copyrightability is that the work be original in the sense of being the creative product of the author's own effort. There is no require-

---

authorship, is a 'derivative work'." 17 *U.S.C.* § 101 (1976).

**9.** "Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copy-

right under the provisions of this title[.]" 17 U.S.C. § 7 (codified 1949).

**10.** "[T]he publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works." 17 U.S.C. § 7 (codified 1949).

ment that it be original in the sense of being novel, that is, the first of its kind in existence.' "). Once it is understood that originality, for copyright purposes, looks to creative process rather than novel outcomes or results, it becomes clear that harmony *can,* as a matter of law, be the subject of copyright.[11]

The one case third-party plaintiff cites which seems to suggest harmony can not be the subject of copyright does so in dicta. *See, e.g., Northern Music Corp. v. King Record Distributing Co.,* 105 F.Supp. 393, 400 (S.D.N.Y.1952) (while indicating in dicta that "neither rhythm nor harmony can in itself be the subject of copyright", the Court found sufficient originality in plaintiff's work overall to warrant copyright protection). We recognize the force of the argument that in most instances, harmony *is* driven by the melody. We note further that where the composition of the melody is completed by one person and the harmony is thereafter furnished by another, the harmony may be less likely to reflect originality than in those instances in which simultaneous composition of melody and harmony is utilized to create certain musical effects. But an abstract per se rule removing harmonies entirely from the scope of copyright protection would, we believe, be too broad and would perhaps deprive appropriate protection to composition which contains sufficient originality and creativity to warrant such protection.

## B. The Standard for Originality

The Court next examines the contention made by the Ellington Estate that the harmony at issue does not satisfy the test of originality. The requirement of originality is rooted in the Constitution, Article I, § 8, cl. 8 (constitutional copyright protection only for "authors"), and is a statutory prerequisite to copyright validity under the revised Copyright Act. 17 U.S.C. § 102 (1976) (express restriction of subject matter of copyright to "original works of authorship"). Although the Copyright Act of 1909 contained no express requirement of originality, courts have read it into the Act.[12]

The standard for originality as applied to derivative works was most forcefully articulated in the Second Circuit sitting en banc in *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486 (2d Cir.1976) (en banc), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). The *Batlin* Court opined, "It has been the law of this circuit for at least 30 years that in order to obtain a copyright ... the work [must] 'contain some substantial, not merely trivial originality[.]' " *Batlin,* 536 F.2d 486, 490 (quoting *Chamberlin v. Uris Sales Corp.,* 150 F.2d 512 (2d Cir.1945)). Distinguishing originality from novelty, the Court continued, "there must be independent creation, but it need not be invention in the sense of striking uniqueness ... since the Constitution differentiates 'authors' and their 'writings' from 'inventors' and their 'discoveries'." *Id.* (cit-

---

**11.** This emphasis on creative process rather than novel outcomes is consistent with the standard in other jurisdictions which emphasize creative inputs beyond mere technical changes any skilled musician could make. *McIntyre v. Double-A Music Corp.,* 166 F.Supp. 681 (S.D.Cal.1958) (describing plaintiff's "inconsequential melodic and harmonic embellishments such as are frequently improvised by any competent musician[,]" the court finds, "Such technical improvisations which are in the common vocabulary of music and which are made every day by singers and other performers, are de minimis contributions and do not qualify for copyright protection"); *Norden v. Oliver Ditson Co.,* 13 F.Supp. 415 (D.Mass.1936) ("a composition, to be the subject of a copyright, must have sufficient originality to make it a new work rather than a copy of the old, with minor changes which any skilled musician might make"); *Cooper v. James,* 213 F. 871 (N.D.Ga.1914) ("anything which a fairly good musician can make, the same old tune being

preserved, could not be the subject of a copyright").

**12.** *See, e.g., L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 490 (2d Cir.1976) (en banc), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976) ("Since the constitutional requirement must be read into the Copyright Act, 17 U.S.C. § 1 *et seq.,* the requirement of originality is also a statutory one"). A House Report says of the 1976 legislation:

> The phrase "original works of authorship," which is purposely left undefined, is intended to incorporate without change the standard of originality established by the courts under the present copyright statute.

H.Rep. No. 1476, 94th Cong., 2d Sess. 51 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5664 (reprinted in *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905 (2d Cir.1980)).

170

ing *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 100 (2d Cir.1951)). Instead, "[o]riginality means that the work owes its creation to the author and this in turn means that the work must not consist of actual copying." *Id.*

In one case, the Second Circuit describes the test of originality as "an extremely low threshold". *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir.1988) (citations and quotation omitted) ("[It] amounts . . . to little more than a prohibition of actual copying. . . . Although slavish copying involving no artistic skill whatsoever does not qualify . . . a showing of virtually any independent creativity will do"). Similar language is found in *Batlin*, which notes, "The test of originality is concededly one with a low threshold in that [a]ll that is needed . . . is that the 'author' contributed . . . something recognizably 'his own'." *Batlin*, 536 F.2d at 490 (1976). However, the *Batlin* Court adds that the standard requires a "distinguishable variation" from public domain work and a " 'minimal element of creativity over and above the requirement of independent effort.' " *Id.* (quoting 1 Nimmer § 10.2); *see also Alfred Bell*, 191 F.2d at 102; *Plymouth Music*, 456 F.Supp. at 679; *Norden v. Oliver Ditson*, 13 F.Supp. 415, 418 (D.Mass.1936) (adopting "distinguishable variation" language).

We find the *Batlin* case to be the more relevant statement of the standard in that, unlike *Gaste*, it dealt specifically with a derivative work.[13] Moreover, the reasoning in *Batlin* more effectively promotes the policies underlying copyright protection:

> Absent a genuine difference between the underlying work of art and the copy of it for which protection is sought, the public interest in promoting progress in the arts—indeed, the constitutional demand . . . could hardly be served. To extend copyrightability to minuscule variations would simply put a weapon for harassment in the hands of mischievous copiers intent

on appropriating and monopolizing public domain work.

*Batlin*, 536 F.2d at 492.

This concern was reiterated by the Seventh Circuit:

> The requirement of originality is significant chiefly in connection with derivative works, where if interpreted too liberally it would paradoxically inhibit rather than promote the creation of such works by giving the first creator a considerable power to interfere with the creation of subsequent derivative works from the same underlying work.

*Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir.1983) (Posner, J.). Criticizing the *Gracen* opinion, however, Nimmer argues that it overstates the risk of giving the owner of the first derivative copyright work a de facto monopoly on all derivative works made from the same underlying work. 1 Nimmer § 3.03. Nimmer contends that the finder of fact could determine that the second derivative work was based on the underlying work rather than upon the first derivative work, except in the rare instance that the variations made in the underlying work by the two derivative works are similar variations. *Id.* While this is true, the risk of copyright confusion seems particularly significant in music cases given that finders of fact often lack musical expertise.

We do not go so far as to conclude, as did the *Gracen* Court, that earlier Second Circuit cases suggesting a more liberal test are superseded. *Gracen*, 698 F.2d at 305. As Nimmer points out, the *Batlin* opinion, taken in context "did not suggest a new test for derivative work originality. On the contrary, it relied heavily upon the teachings of *Alfred Bell* [and cites approvingly the] low threshold [test]." 1 Nimmer § 3.03. We do find, however, that the *Batlin* test more effectively articulates a workable test than *Gaste* in light of the complications faced by courts reviewing copyright validity of derivative works.

---

**13.** In *Batlin*, the Second Circuit held that appellant's plastic Uncle Sam bank, a derivative work based on similar banks in the public domain, was insufficiently original to support a copyright. Although the instant case involves preexisting work which is the subject of copyright, the standard

announced in *Batlin* is fully applicable. *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir.1980) (applying *Batlin* standard in case involving preexisting work which was the subject of copyright).

■ Applying the standard for copyrightability, as stated above, the Court is unconvinced that, as a matter of law, no protectable work exists in the harmony at issue. First, the Court rejects third-party plaintiffs' argument that the existence of a substantially similar harmony in IW2, the uncopyrightable [14] 1953 sound recording of Satin Doll, precludes a finding that the harmony in the Derivative Work is original. The release and distribution of the sound recording is distinguishable from the treatment underlying a subsequent television pilot script in *Shaw v. Lindheim*, 809 F.Supp. 1393 (C.D.Cal.1992), and the pre–1948 "Amos 'n' Andy" radio scripts underlying subsequent copyrightable radio and television scripts and programs in *Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir.1989). In those cases, the earlier, uncopyrighted works were found to be in the public domain and, therefore, precluded copyright protection for those elements of the subsequent works containing material from the earlier works.

The distribution of the 1953 sound recording in the instant case is distinguishable because "such [recordings] did not enter the public domain by reason of such sales and therefore remain eligible for full copyright protection[.]" 1 Nimmer § 4.05[B][2]. Released sound recordings were not "injected into the public domain" because under the 1909 Act, the public distribution of phonorecords did not constitute publication of the works recorded. *Id.* at § 4.05[B]. In *Rosette v. Rainbo Record Mfg. Corp.*, 354 F.Supp. 1183 (S.D.N.Y.1973), *aff'd per cu-*

*riam*, 546 F.2d 461 (2d Cir.1976), Judge Gurfein held that "the sale of phonograph records is not a divestment of common law rights by publication" because these sound recordings do not constitute "copies" of the composition recorded.[15] According to Nimmer, "the *Rosette* opinion is a creative attempt to deal with the problem of industry practice in such a manner as to save a great number of musical compositions from the public domain." 1 Nimmer § 4.05[B][2], n. 30.[16]

Given that the 1953 sound recording was not within the scope of the public domain, the harmony contained therein remained eligible for full copyright protection. Therefore, the existence of IW2 does not, as a matter of law, preclude a finding that the Derivative Work harmony is original, although its existence is of course relevant to the issue of whether the disputed work reflects adequate creativity and collaboration on Strayhorn's part.[17]

■ The Court also rejects third-party plaintiffs' second argument concerning whether the Derivative Work harmony is non-original as a matter of law. The third party plaintiffs contend that similar bars of harmony can be found in other Ellington works. We remain unpersuaded that in composing the Derivative Work, the authors did not, as a matter of law, "create a protectable work by combining various common elements so as to produce a unique expression of music." *Levine v. McDonald's Corp.*, 735

---

14. "Sound recordings fixed prior to February 15, 1972, are not eligible for statutory copyright under the present Act, nor were they eligible for statutory copyright under the 1909 Act, even after the Act was amended by the Sound Recording Act." 1 Nimmer § 4.06[B] (footnotes omitted).

15. For reasons we need not be concerned with here, Judge Gurfein stopped short of according full common law copyright to compositions after the sale of records. For fuller discussion, see 1 Nimmer § 4.05[B][2] (noting *Rosette* is most authoritative decision on the issue under 1909 Act and that it has been followed by *Jones v. Virgin Records, Ltd.*, 643 F.Supp. 1153 (S.D.N.Y.1986) (1909 Act)).

16. Nimmer notes:
Even under the 1909 Act, copyright protection could be assured by depositing a manuscript copy of the music as an unpublished work....

Copyright owners ..., however, frequently failed to obtain statutory copyright of musical compositions before selling records of the compositions.... This apparent absence of prudence was in some part due to a desire to avoid subjecting the recorded composition to the compulsory license provisions of Section 1(e) of the 1909 Act, in an attempt to exploit a medium regulated by statute without submitting to that regulation.
1 Nimmer § 4.05[B][4].

17. The Court denies the third-party defendant's motion to strike, on relevance grounds, references to IW2 and other statements made in Judith Finell's affidavit. At trial, an examination into these facts could shed light on the issue of Strayhorn's contribution to the harmony.

F.Supp. 92 (S.D.N.Y.1990) (denying summary judgment on issue of whether song using "patter" technique is unprotectable as a matter of law). In *Levine,* the district court was confronted with an issue concerning whether the patter technique [18] used in the song "Life is a Rock But the Radio Rolled Me" ("LIFE") was sufficiently original to warrant copyright protection. Finding that "plaintiffs could have composed a patter song in numerous ways, but chose instead the particular expression that became LIFE[,]" the Court said, "Thus, there is no merit to defendant's argument that recognition of a copyright in LIFE by a jury in this case will allow plaintiffs 'to tie up the centuries old concept of a patter song.'" *Id.* (noting the myriad of songs which fall in the "patter" genre, including, presumably, rap).

As was the case in *Levine,* we can not find that, "as a matter of law, the [work] is too simple or lacking in creativity to be protectable under the copyright laws." *Id.* at 99. Instead, the issue of originality as it relates to validity of the Derivative Works is a question for the finder of fact at trial.

### CONCLUSION

The motion for partial summary judgment and cross-motion for summary judgment are denied, as is the motion to strike. The parties are to consult with each other and advise the Court in writing on or before January 26, 1994 as to when they will be ready for trial.

SO ORDERED.

---

**18.** The patter technique involves combining mo-      notonic repetition of sixteenth notes.