698 F.2d 300
 217 U.S.P.Q. 1294, 1983 Copr.L.Dec. P 25,490
 Jorie GRACEN, Plaintiff, Counterdefendant-Appellant,
v.
The BRADFORD EXCHANGE and Metro-Goldwyn-Mayer, Defendants,
Counterplaintiffs- Appellees,
and
Edwin M. Knowles China Company and James Auckland, Defendants.
 No. 82-1795.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 7, 1982.
Decided Jan. 12, 1983.
 
 Charles Rowe, Chicago, Ill., for plaintiff, counterdefendant-appellant.
 Robert W. Gettleman, Arthur Don, D'Ancona & Pflaum, Chicago, Ill., for defendants, counterplaintiffs-appellees.
 Before BAUER and POSNER, Circuit Judges, and HOFFMAN, Senior District Judge.*
 POSNER, Circuit Judge.
 
 
 1
 This appeal brings up to us questions of some novelty, at least in this circuit, regarding implied copyright licenses and the required originality for copyrighting a derivative work.
 
 
 2
 In 1939 MGM produced and copyrighted the movie "The Wizard of Oz." The central character in the movie, Dorothy, was played by Judy Garland. The copyright was renewed by MGM in 1966 and is conceded, at least for purposes of this case, to be valid and in effect today. In 1976 MGM licensed Bradford Exchange to use characters and scenes from the movie in a series of collectors' plates. Bradford invited several artists to submit paintings of Dorothy as played by Judy Garland, with the understanding that the artist who submitted the best painting would be offered a contract for the entire series. Bradford supplied each artist with photographs from the movie and with instructions for the painting that included the following: "We do want your interpretation of these images, but your interpretation must evoke all the warm feeling the people have for the film and its actors. So, your Judy/Dorothy must be very recognizable as everybody's Judy/Dorothy."
 
 
 3
 Jorie Gracen, an employee in Bradford's order-processing department, was permitted to join the competition. From photographs and her recollections of the movie (which she had seen several times) she made a painting of Dorothy as played by Judy Garland; Figure 1 at the end of this opinion is a reproduction of a photograph of Miss Gracen's painting (an inadequate one, because the original is in color). Bradford exhibited it along with the other contestants' paintings in a shopping center. The passersby liked Miss Gracen's the best, and Bradford pronounced her the winner of the competition and offered her a contract to do the series, as well as paying her, as apparently it paid each of the other contestants, $200. But she did not like the contract terms and refused to sign, and Bradford turned to another artist, James Auckland, who had not been one of the original contestants. He signed a contract to do the series and Bradford gave him Miss Gracen's painting to help him in doing his painting of Dorothy. The record does not indicate who has her painting now.
 
 
 4
 Gracen's counsel describes Auckland's painting of Dorothy as a "piratical copy" of her painting. Bradford could easily have refuted this charge, if it is false, by attaching to its motion for summary judgment a photograph of its Dorothy plate, but it did not, and for purposes of this appeal we must assume that the plate is a copy of Miss Gracen's painting. This is not an absurd supposition. Bradford, at least at first, was rapturous about Miss Gracen's painting of Dorothy. It called Miss Gracen "a true prodigy." It said that hers "was the one painting that conveyed the essence of Judy's character in the film ... the painting that left everybody saying, 'That's Judy in Oz.' " Auckland's deposition states that Bradford gave him her painting with directions to "clean it up," which he understood to mean: do the same thing but make it "a little more professional."
 
 
 5
 Miss Gracen also made five drawings of other characters in the movie, for example the Scarecrow as played by Ray Bolger. Auckland's affidavit states without contradiction that he had not seen any of the drawings when he made his paintings of those characters. Pictures of the plates that were made from his paintings are attached to the motion for summary judgment filed by MGM and Bradford, but there is no picture of his Dorothy plate, lending some support to the charge that it is a "piratical copy." But apparently the other plates are not copies at all.
 
 
 6
 Auckland completed the series, and the plates were manufactured and sold. But Miss Gracen meanwhile had obtained copyright registrations on her painting and drawings, and in 1978 she brought this action for copyright infringement against MGM, Bradford, Auckland, and the manufacturer of the plates. MGM and Bradford counterclaimed, alleging among other things that Miss Gracen had infringed the copyright on the movie by showing her drawings and a photograph of her painting to people whom she was soliciting for artistic commissions.
 
 
 7
 The district court granted summary judgment against Miss Gracen on both the main claim and the counterclaim. It held that she could not copyright her painting and drawings because they were not original and that she had infringed MGM's copyright. The court entered judgment for $1500 on the counterclaim. Neither the judgment nor the opinion accompanying it refers to the noncopyright claims in the counterclaim, thus inviting the question whether that judgment is final and hence appealable under 28 U.S.C. Sec. 1291. But this is not a serious problem, because the judgment purports to dispose of "their [MGM's and Bradford's] counterclaims" and both sides have treated it as disposing of the counterclaim in its entirety. The noncopyright claims must therefore be regarded as having been either dismissed or abandoned.
 
 
 8
 The briefs and argument in this court follow the district court in treating the principal question as whether Miss Gracen's painting and drawings are sufficiently original to be copyrightable as derivative works under 17 U.S.C. Sec. 103. But this emphasis may be misplaced. The question of the copyrightability of a derivative work ("a work based upon one or more preexisting works, such as a[n] ... art reproduction ... or any other form in which a work may be recast, transformed, or adapted," 17 U.S.C. Sec. 101) usually arises in connection with something either made by the owner (or a licensee) of the copyright on the underlying work, as in Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 909 (2d Cir.1980), or derived from an underlying work that is in the public domain, as in L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 491-92 (2d Cir.1976) (en banc). At issue in such a case is not the right to copy the underlying work but whether there is enough difference between the derivative and the underlying work to satisfy the statutory requirement of originality, see 17 U.S.C. Sec. 102(a), and thus make the derivative work copyrightable. Since the copyright owner's bundle of exclusive rights includes the right "to prepare derivative works based upon the copyrighted work," 17 U.S.C. Sec. 106(2), even if Miss Gracen's painting and drawings had enough originality to be copyrightable as derivative works she could not copyright them unless she had authority to use copyrighted materials from the movie. "[P]rotection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully." 17 U.S.C. Sec. 103(a).
 
 
 9
 Miss Gracen does not claim that she painted the 16-year-old Judy Garland who appeared in "The Wizard of Oz" in 1939 from life or from photographs taken from the movie, or that her painting is not of Judy Garland but is an imaginative conception of the character Dorothy. The painting was based on the movie, both as independently recollected by Miss Gracen and as frozen in the still photographs that Bradford supplied her. As with any painting there was an admixture of the painter's creativity--how much we shall consider later--but that it is a painting of Judy Garland as she appears in photographs from the movie (such as the photograph reproduced at the end of this opinion as Figure 2), and is therefore a derivative work, is beyond question. The same is true of the drawings.
 
 
 10
 Therefore, if Miss Gracen had no authority to make derivative works from the movie, she could not copyright the painting and drawings, and she infringed MGM's copyright by displaying them publicly. But obviously she had some authority, having been invited by Bradford to make a painting of Dorothy based on the movie. And although Bradford was not expressly authorized to sublicense the copyright in this way, there can be no serious doubt of its authority to do so. Thus the question is not whether Miss Gracen was licensed to make a derivative work but whether she was also licensed to exhibit the painting and to copyright it.
 
 
 11
 Bradford made no written agreement with the contestants for the disposition of their paintings. It could have required each contestant to give it full rights as consideration for $200 and a shot at a potentially lucrative contract, but it did not do so, not in writing anyway, and though it argues that it "bought" Miss Gracen's painting of Dorothy for $200 we find no evidence to support this characterization of the transaction. Miss Gracen testified in her deposition that Foster, who was in charge of the contest, said he would return the painting to her; and we must ask what he thought she would do with the painting when she got it back, if they failed to come to terms. Destroy it? Keep it in a closet till MGM's copyright expired? Bradford, in promising Miss Gracen (as for purposes of this appeal we must assume it did) that she could keep the painting, must have known she would exhibit it to advance her career as an artist. And while Bradford's license from MGM may not have authorized it to make any such promise, Bradford may have had apparent authority to do so and that is all that would be necessary to give Miss Gracen (who presumably knew nothing of the terms of the license) the right to exhibit her painting. See Seavey, Handbook of the Law of Agency 125-28 (1964). We do not say she actually had the right, but only that there is a genuine issue of material fact concerning the scope of her implied license to make a derivative work.
 
 
 12
 It is less likely that Miss Gracen was entitled to exhibit, or even to make, the drawings. Their making was no part of the contest. Yet she testified that Foster told her to make the drawings to improve her chances of winning, and this testimony was not contradicted or inherently incredible. If she was authorized to make the drawings maybe she was also authorized--or reasonably believed she was authorized--to exhibit them, at least if she did not come to terms with Bradford.
 
 
 13
 The grant of summary judgment on the counterclaim was therefore erroneous--assuming an oral nonexclusive copyright license is enforceable. Nimmer describes this as the law both before and after the Copyright Act was revised in 1976, see 3 Nimmer on Copyright Secs. 10.03[A]-[B] at pp. 10-36 to 10-37 and nn. 17, 22, 23 (1982), and though support for this conclusion is sparse, and there is some contrary authority, see Douglas Int'l Corp. v. Baker, 335 F.Supp. 282, 285 (S.D.N.Y.1971), we think Nimmer is right. This case shows why. MGM and Bradford do not even argue that Bradford had no authority to permit Miss Gracen to make a derivative work, though nothing in the license to Bradford purports to authorize sublicensing. They thus tacitly acknowledge the impracticality of requiring written licenses in all circumstances; and we do not see how it can be argued that only the existence and not the scope of a license can be proved by parol evidence.
 
 
 14
 This disposes of the counterclaim, but we have still to consider Miss Gracen's claim that she had valid copyrights which the defendants infringed. The initial issue is again the scope of her implied license from Bradford. Even if she was authorized to exhibit her derivative works, she may not have been authorized to copyright them. Bradford was licensed to use MGM's copyright in its series of collectors' plates but not to copyright the derivative works thus created. A copyright owner is naturally reluctant to authorize a licensee to take out copyrights on derivative works--copyrights that might impede him in making his own derivative works or in licensing others to do so. And it would have made no more sense for Bradford, the licensee, to arm Miss Gracen, its sublicensee, with a weapon--the right to copyright her derivative works--that she could use to interfere with Bradford's efforts to get another artist to do the plates if it could not cut a deal with her. The affidavits submitted with the motions for summary judgment deny that Miss Gracen was authorized to copyright derivative works based on the movie and are not contradicted on this point. (In contrast, they do not deny that she was authorized to exhibit her painting of Dorothy.)
 
 
 15
 We are reluctant to stop here, though, and uphold the dismissal of the complaint on the basis of an issue of fact that the district judge did not address, and that we therefore may have got wrong, so we shall go on and consider his ground for dismissal of the complaint--that Miss Gracen's painting and drawings are not original enough to be copyrightable.
 
 
 16
 Miss Gracen reminds us that judges can make fools of themselves pronouncing on aesthetic matters. But artistic originality is not the same thing as the legal concept of originality in the Copyright Act. Artistic originality indeed might inhere in a detail, a nuance, a shading too small to be apprehended by a judge. A contemporary school of art known as "Super Realism" attempts with some success to make paintings that are indistinguishable to the eye from color photographs. See Super Realism: A Critical Anthology (Battcock ed. 1975). These paintings command high prices; buyers must find something original in them. Much Northern European painting of the Renaissance is meticulously representational, see, e.g., Gombrich, The Story of Art 178-80 (13th ed. 1978), and therefore in a sense--but not an aesthetic sense--less "original" than Cubism or Abstract Expressionism. A portrait is not unoriginal for being a good likeness.
 
 
 17
 But especially as applied to derivative works, the concept of originality in copyright law has as one would expect a legal rather than aesthetic function--to prevent overlapping claims. See L. Batlin & Son, Inc. v. Snyder, supra, 536 F.2d at 491-92. Suppose Artist A produces a reproduction of the Mona Lisa, a painting in the public domain, which differs slightly from the original. B also makes a reproduction of the Mona Lisa. A, who has copyrighted his derivative work, sues B for infringement. B's defense is that he was copying the original, not A's reproduction. But if the difference between the original and A's reproduction is slight, the difference between A's and B's reproductions will also be slight, so that if B had access to A's reproductions the trier of fact will be hard-pressed to decide whether B was copying A or copying the Mona Lisa itself. Miss Gracen's drawings illustrate the problem. They are very similar both to the photographs from the movie and to the plates designed by Auckland. Auckland's affidavit establishes that he did not copy or even see her drawings. But suppose he had seen them. Then it would be very hard to determine whether he had been copying the movie stills, as he was authorized to do, or copying her drawings.
 
 
 18
 The painting of Dorothy presents a harder question. A comparison of Figures 1 and 2 reveals perceptible differences. A painting (except, perhaps, one by a member of the Super Realist school mentioned earlier) is never identical to the subject painted, whether the subject is a photograph, a still life, a landscape, or a model, because most painters cannot and do not want to achieve a photographic likeness of their subject. Nevertheless, if the differences between Miss Gracen's painting of Dorothy and the photograph of Judy Garland as Dorothy were sufficient to make the painting original in the eyes of the law, then a painting by an Auckland also striving, as per his commission, to produce something "very recognizable as everybody's Judy/Dorothy" would look like the Gracen painting, to which he had access; and it would be difficult for the trier of fact to decide whether Auckland had copied her painting or the original movie stills. True, the background in Miss Gracen's painting differs from that in Figure 2, but it is drawn from the movie set. We do not consider a picture created by superimposing one copyrighted photographic image on another to be "original"--always bearing in mind that the purpose of the term in copyright law is not to guide aesthetic judgments but to assure a sufficiently gross difference between the underlying and the derivative work to avoid entangling subsequent artists depicting the underlying work in copyright problems.
 
 
 19
 We are speaking, however, only of the requirement of originality in derivative works. If a painter paints from life, no court is going to hold that his painting is not copyrightable because it is an exact photographic likeness. If that were the rule photographs could not be copyrighted--the photographs of Judy Garland in "The Wizard of Oz," for example--but of course they can be, 1 Nimmer on Copyright Sec. 2.08[E] (1982). The requirement of originality is significant chiefly in connection with derivative works, where if interpreted too liberally it would paradoxically inhibit rather than promote the creation of such works by giving the first creator a considerable power to interfere with the creation of subsequent derivative works from the same underlying work.
 
 
 20
 Justice Holmes' famous opinion in Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903), heavily relied on by Miss Gracen, is thus not in point. The issue was whether lithographs of a circus were copyrightable under a statute (no longer in force) that confined copyright to works "connected with the fine arts." Holmes' opinion is a warning against using aesthetic criteria to answer the question. If Miss Gracen had painted Judy Garland from life, her painting would be copyrightable even if we thought it kitsch; but a derivative work must be substantially different from the underlying work to be copyrightable. This is the test of L. Batlin & Son, Inc. v. Snyder, supra, 536 F.2d at 491, a decision of the Second Circuit--the nation's premier copyright court--sitting en banc. Earlier Second Circuit cases discussed in Batlin that suggest a more liberal test must be considered superseded.
 
 
 21
 We agree with the district court that under the test of Batlin Miss Gracen's painting, whatever its artistic merit, is not an original derivative work within the meaning of the Copyright Act. Admittedly this is a harder case than Durham Industries, Inc. v. Tomy Corp., supra, heavily relied on by the defendants. The underlying works in that case were Mickey Mouse and other Walt Disney cartoon characters, and the derivative works were plastic reproductions of them. Since the cartoon characters are extremely simple drawings, the reproductions were exact, differing only in the medium. The plastic Mickey and its cartoon original look more alike than Judy Garland's Dorothy and Miss Gracen's painting. But we do not think the difference is enough to allow her to copyright her painting even if, as we very much doubt, she was authorized by Bradford to do so.
 
 
 22
 The judgment dismissing the complaint is therefore affirmed. The judgment on the counterclaim is vacated and the case remanded for further proceedings consistent with this opinion. No costs in this court.
 
 
 23
 SO ORDERED.
 
 
 24
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLENOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 Of the Eastern District of Virginia